**United States District Court**
**Northern District of Indiana**
**Hammond Division**

| | | |
|---|---|---|
| LYNTECH ENG'G, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:09-CV-54 JVB |
| | ) | |
| SPX CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

**A. Procedural Posture**

Plaintiff Lyntech Engineering, Inc., sued its former contractual partner, Defendant SPX Corp., under the theories of breach of contract, fraud, and promissory estoppel. After the close of discovery, Defendant moved for summary judgment on Plaintiff's claims. In addition, Defendant moved to exclude the testimony of Plaintiff's damages expert Stan V. Smith. In its response to the motion for summary judgment, Plaintiff conceded its breach of contract and promissory estoppel claims. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. at 1.) Accordingly, only the fraud claims remain at issue.

**B. Summary Judgment Standard**

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986).

**C. Background and Facts**

Defendant is "a number of businesses that provide products and services associated with global infrastructure, diagnostic tools, and process equipment." (Def.'s Br. Supp. Mot. Summ. J. at 2.) Defendant formerly operated a division named SPX Contech. (Pl.'s Resp. Def.'s Mot.

Summ. J. Ex. A, Dep. of Jason Hudkins ("Hudkins Dep.") at 81.) Through its SPX Contech division, Defendant supplied JTEKT Automotive with a vehicular part known as a rack housing. (Def.'s Br. Supp. Mot. Summ. J. Ex. E, Britton Dep. at Doc. 74-5, p. 5.) JTEKT then incorporated this part into the manufacture of steering gears and systems and sold the finished product to major automotive companies such as Toyota. (*See id*. at 3–5.) In April 2007, Defendant sold its Contech branch to Marathon Automotive Group for $146 million. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. A, Hudkins Dep. at 81.) After this change in ownership, SPX Contech was renamed to Contech US, LLC. (Def.'s Br. Supp. Mot. Summ. J. Ex. A, Hudkins Dep. at 85.) Around January 2009, Contech US went bankrupt. (*See id.* at 90.) The bankrupt company's assets were purchased by Contech Castings, LLC. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. D, Asher Dep. at 4.)

Plaintiff Lyntech Engineering is a corporation focused on machine design, machine building, and production machining. (Def.'s Br. Supp. Mot. Summ. J. Ex. A, Hudkins Dep. at 20.) Its two officers and sole shareholders are its President, Jason Hudkins ("Hudkins"), and its Vice President, Amanda Hudkins. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. A, Hudkins Dep. at 21.) In 2004 or 2005, Lyntech began machining parts for SPX Contech. (*Id*. at 22.) Some of this early work focused on producing Toyota Tacoma parts and required Lyntech to drill holes in, and then deslug, automotive components. (*Id*. at 27.) During this time, Hudkins's main contact at SPX Contech was Forrester Asher; Hudkins also engaged in some business with SPX Contech representative Tavid Markarian. (*Id*. at 30–32.) Hudkins had "a casual business relationship" with Asher that was "cordial," and Hudkins believed Asher was "fairly easy to talk to." (*Id*.) Prior to terminating the purchase order, SPX Contech honored all its obligations to Lyntech. (*See*

Pl.'s Resp. Def.'s Mot. for Summ. J. Ex. E, Hudkins Aff. ¶¶ 5–9.) Hudkins believes that SPX Contech's representatives appeared honest and straight-forward in their past dealings. (*Id*.)

The basis for this suit is purchase order no. 637095, which SPX Contech issued to Lyntech on October 3, 2006. (Def.'s Br. Supp. Mot. Summ. J. at 4; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. I, Purchase Order No. 637098.) The purchase order was a blanket purchase order ("blanket p.o.") that required Lyntech to machine one-third the volume of parts for the 180L Program. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. D, Asher Dep. at 22–24; Ex. I, Purchase Order No. 637098.) The 180L Program involved producing parts for Toyota Tundras, and part of this process required Lyntech to machine off excess aluminum. (Def.'s Br. Supp. Mot. Summ. J. Ex. A, Hudkins Dep. at 65.) Lyntech was then able to sell this aluminum cut-off as scrap. (*Id*. at 100.) The excess aluminum generated from the 180L Program parts compromised about 98% of all aluminum scrap sold by the Plaintiff. (DE 64-1, Pl.'s Mot. Leave File Sur-Rep. Opp'n Def.'s Rep. Ex. 1, at p. 7.)

After working under the purchase order for eleven months, Contech US—the company SPX Contech changed into following its sale—canceled the contract on September 7, 2007, under the directive of Tavid Markarian. (*See* Def.'s Br. Supp. Mot. for Summ. J. Ex. C, Markarian Dep. at 82–83.) Before cancelation, Lyntech manufactured about 172,411 parts for the 180L Program. (Def.'s Br. Supp. Mot. Exclude Ex. B, Report of Stan V. Smith at 2.) Markarian and Asher made the decision to cancel the contract because Contech US had idle machinery and was then-capable of machining parts in-house. (Def.'s Br. Supp. Mot. for Summ. J. Ex. C, Markarian Dep. at 82–83.) Hudkins believes that Markarian and Asher did not cancel the purchase order "just to harm Lyntech," but that the cancelation was a business decision on Contech US's part. (Def.'s Br. Supp. Mot. Summ. J. Ex. A, Hudkins Dep. at 90.)

The parties contest several components of this blanket p.o. The first dispute concerns the length of time that the 180L Program was expected to run. Hudkins asserts that SPX Contech's representatives "verbally communicated" to him that the Toyota was running its Tundra program for eight years; Hudkins believed this was accurate as it is common knowledge in the automotive industry that programs like the 180L last for lengthy periods of time. (Pl.'s Resp. Def.'s Mot. Summ. J. at 6; Ex. A, Hudkins Dep. at 62, 66.) Asher, however, stated that the typical life of programs like the 180L is only about five years. (*Id.* at Ex. D, Asher Dep. at 28–29.) Markarian testified that he did not know how long the 180L Program would last and only assumed it would last longer than a year. (*Id.* at Ex. F, Markarian Dep. at 37–38.) Notably, Contech Castings—the company that purchased Contech US's assets out of bankruptcy proceedings—still produces parts for JTEKT under the 180L Program. (Def.'s Br. Supp. Mot. Summ. J. Ex. E, Britton Dep. at Doc. 74-5, p. 5, 8.)

Second, both parties dispute how many years the blanket p.o. was intended to apply. Hudkins states that the price Lyntech gave SPX Contech to machine parts was "based on 400,000 pieces a year for eight years." (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. A, Hudkins Dep. at 65.) Hudkins also insists that he "was expressly told by Asher in mid to late September, [sic] 2006 that Lyntech would probably get the full volume of the project, 400,000 pieces per year," but that SPX Contech would "issue the purchase order for one-third (1/3) of the volume per year or 133,333 pieces per year for the eight (8) year life of the program." (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. E, Hudkins Aff. ¶ 9.) Both Asher and Markarian acknowledge that Hudkins wanted a long-term commitment from SPX Contech. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. E, Asher Dep. at 29–32; Ex. F, Markarian Dep. at 43–44.) Further, Asher was aware that Plaintiff needed a long-term blanket p.o. in order to finance the purchase of the new machines it needed to

complete the job. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. E, Asher Dep. at 31.) Asher believes, though, that he told Hudkins that SPX Contech was only looking for a "short term" commitment. (*Id.* at 24.) Asher does not remember if anyone else was present when he told Hudkins this or exactly when this was said. (*Id*. at 24–25.) Asher also did not recall if he put in writing the fact that Lyntech was receiving a short term commitment. (*Id.* at 25.) When Markarian was asked if SPX informed Lyntech that its purchase order was long-term, he responded, "Uh, I did not. Whether someone else did or not, I don't know." (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. F, Markarian Dep. at 94.) Lastly, the purchase order lacks any dates that indicate the length of time the agreement covers. (Pl.'s Resp. Def.'s Mot. Summ. J. at 11; Ex. I, Purchase Order No. 637098.)

Third, the parties dispute whether or not the blanket p.o. could be terminated for convenience. Plaintiff contends that, assuming SPX Contech could cancel and be relieved of its obligation at any time, both Asher and SPX misrepresented the terms of the contract to Hudkins. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. E, Hudkins Aff. ¶¶ 8–11.) Moreover, Plaintiff alleges that it did not receive the second page of the blanket p.o., containing the termination for convenience clause, until it filed its earlier lawsuit against Contech US. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. A, Hudkins Dep. at 61.) Relying on SPX Contech's representations, Plaintiff used the blanket p.o. to secure financing for two machines at a cost of $182,000 and for a box truck valued around $28,350. (*See* Def.'s Br. Supp. Mot. Exclude Ex. B, Report of Stan V. Smith at 2.) Plaintiff also built an addition to its facility for about $120,000 in reliance on Defendant's representations. (*Id*.) Last, Plaintiff hired and trained three new employees in anticipation of working for a full eight years under the contract. (Def.'s Br. Supp. Mot. Exclude Ex. C, Amanda Hudkins Dep. at 73–74.) Brad Bucher, a small business banker at First Source Bank in Plymouth, Indiana, can

corroborate that the bank required an eight year life on the contract before it would provide a loan to the Plaintiff. (Pl.'s Resp. Def.'s Mot. Summ. J. at 12 n.8.)

Hudkins admits that he did not read the entire purchase order once Lyntech received it by fax, but he did look at provisions such as the unit price to make sure the bank would find it acceptable and provide Plaintiff with a loan. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. A, Hudkins Dep. at 63–64.) Hudkins never read the provision of the order that states the blanket p.o. constitutes an offer that includes the terms and conditions on both pages of the document. (*See id*.) SPX insists that termination for convenience clauses are common in the automotive industry and, at deposition, JTEKT representative David Britton testified that such clauses are routinely used. (Def.'s Br. Supp. Mot. Summ. J. Ex. E, Britton Dep. at Doc. 74-5, p. 10.) Moreover, Markarian stated that he canceled "dozens" of purchase orders through this clause while working at SPX Contech. (Def.'s Br. Supp. Mot. Summ. J. Ex. C, Markarian Dep. at 91–92.)

**D. Discussion**

The elements of actual fraud and fraud in the inducement are: (1) a material representation of past or existing fact by the party to be charged, (2) which was false, (3) which was made with knowledge or reckless ignorance of the falseness, (4) which was relied upon by the complaining party, and (5) proximately caused the complaining party injury. *See Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind. 1996); *Circle Ctr. Dev. Co. v. Y/G Ind. L.P.*, 762 N.E.2d 176, 179 (Ind. Ct. App. 2002)). "Fraudulent inducement occurs when a party is induced through fraudulent misrepresentation to enter into a contract." *Tru-Cal, Inc. v. Conrad Kacsik Instrument Sys., Inc.*, 905 N.E.2d 40, 44 n.6 (Ind. Ct. App. 2009). "Actual fraud may not be based on representations of future conduct, on broken promises, or on representations of existing intent that are not

executed." *Wallem v. CLS Indus., Inc.*, 725 N.E.2d 880, 889 (Ind. Ct. App. 2000) (citation omitted).

"Fraud need not be proven by direct or positive evidence; it may be proven by circumstantial evidence, provided there are facts from which the existence of all the elements can be reasonably inferred." *Plymale v. Upright*, 419 N.E.2d 756, 760 (Ind. Ct. App. 1981). "Whether certain statements were made as asserted is on conflicting evidence a question of fact for the jury." *Ruff v. Charter Behavioral Health Sys. of N.W. Ind. Inc.*, 699 N.E.2d 1171, 1175 (Ind. Ct. App. 1998) (citing *Plymale*, 419 N.E.2d at 760); *see also Plymale*, 419 N.E.2d at 760 n.1 ("[I]f there is proof as to all of the essential elements of fraud, and the evidence is conflicting, the question of fraud is one of fact for the jury, under proper instructions from the court as to what constitutes fraud, or for the court sitting as the trier of facts." (citation omitted)).

Additionally, "[t]o prevail on a fraud claim, the plaintiff must establish reasonable reliance upon a material misrepresentation by the defendant." *Dean V. Kruse Found., Inc. v. Gates*, 932 N.E.2d 763, 768 (Ind. Ct. App. 2010) (citing *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. Ct. App. 2004)). A person is bound to use ordinary care and diligence to guard against fraud. *See Grissom v. Moran*, 290 N.E.2d 119, 124 (Ind. App. 1972). "The right of reliance is . . . tightly bound up with the duty of a representee to be diligent in safeguarding his interests. The legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations." *Plymale*, 419 N.E.2d at 762. If a party is lulled into believing another's representation of the contents of a document, and a relationship of trust and confidence exists between the deceived and the deceiver, the victim's reliance may still be reasonable. *See id*. But, "[t]o justify the repose of trust and confidence by one party in another, there must be a dominant and subordinate party. As a matter of law, no such relationship

arises when the parties deal at arm's length." *Pugh*'*s IGA*, *Inc. v. Super Food Servs.*, *Inc.*, 531 N.E.2d 1194, 1198 (Ind. Ct. App. 1988) (citations omitted).

Normally, "[t]he parol evidence rule bars the admission of evidence of oral representations that contradicts a written contract." *Am.*'*s Directories Inc.*, *Inc. v. Stellhorn One Hour Photo*, *Inc.*, 833 N.E.2d 1059, 1066 (Ind. Ct. App. 2005) (citing *Ruff*, 699 N.E.2d at 1175). "Generally, where parties have reduced an agreement to writing and have stated in an integration clause that the written document embodies the complete agreement between the parties, the parol evidence rule prohibits courts from considering extrinsic evidence for the purpose of varying or adding to the terms of the written contract." *Id*. (citing *I.C.C. Protective Coatings*, *Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1035 (Ind. Ct. App.1998)). "However, the prohibition against the use of parol evidence is by no means absolute." *Id.* (citing *I.C.C. Protective Coatings*, 695 N.E.2d at 1035). "Parol evidence may be considered if it is not being offered to vary the terms of the written contract, and to show that fraud, intentional misrepresentation, or mistake entered into the formation of a contract." *Id*. (citing *Krieg v. Hieber*, 802 N.E.2d 938, 944 (Ind. Ct. App. 2004)). A party can "overcome the effect of an integration clause if it [can] show it had a right to rely on the alleged misrepresentations and did in fact rely on them in executing the release and/or integration clause." *Tru-Cal*, *Inc*., 905 N.E.2d at 45 (citations omitted). Whether one party had this right to rely on the other's statements depends largely on the facts and circumstance of the case. *See id*. at 46 (citing *Prall v. Ind. Nat'l Bank*, 627 N.E.2d 1374, 1379 (Ind. Ct. App. 1994)).

**(1)** *Integration Clause*

As an initial matter, the Court notes that the reverse side of Defendant's purchase order contains the following integration clause under the ACCEPTANCE paragraph:

> ACCEPTANCE OF THE ORDER SHALL CONSTITUTE
> SELLER'S AGREEMENT TO COMPLY WITH AND BE
> BOUND BY THESE TERMS AND CONDITIONS. ANY
> ADDITIONAL OR INCONSISTENT TERMS OR CONDITIONS
> CONTAINED IN ANY QUOTATION, BID,
> ACKNOWLEDGEMENT, OR OTHER DOCUMENT OF
> SELLER ARE OBJECTED TO BY BUYER AND SHALL NOT
> BE EFFECTIVE OR BINDING AS TO BUYER, UNLESS
> AGREED IN WRITING AND SIGNED BY AN OFFICER OR
> BUYER. Upon acceptance, the Order constitutes the entire
> agreement of Buyer and Seller.

(Def.'s Br. Supp. Mot. Summ. J. Ex. A, at Doc. 74-1, p. 49). However, in cases where fraud is alleged, the parol evidence rule will not bar testimony that contradicts the written terms of a document. *Am.'s Directories*, 833 N.E.2d at 1066. As Plaintiff maintains claims of actual fraud and fraud in the inducement against Defendant, the parol evidence rule will not bar Plaintiff's evidence that Defendant's representatives orally promised Hudkins terms that vary from those in the blanket p.o. (Pl.'s Resp. Def.'s Mot. Summ. J. at 1.)

**(2)** *No Genuine Issues of Material Fact Exist for Plaintiff's Fraud-based Claims*

(a) *Plaintiff has Failed to Show a False "Past or Existing" Fact*

Plaintiff's fraud-based claims fail because Plaintiff cannot demonstrate that Defendant's agents made a material representation of past or existing fact which was false. The crux of Plaintiff's argument is that "Asher and Markarian told [Hudkins] [the 180L Program] was an eight (8) year program" and that Defendant "would issue" the contract for the program's entire life. (Pl.'s Resp. Def.'s Mot. Summ. J. at 9–10.) First, the Court notes that Plaintiff agrees the 180L program is still ongoing. (*Id*. at 10, 20–21.) Thus, although Asher and Markarian now assert they were unsure about how long the Toyota planned to run their program, this does not

10

make any of their statements that the program would last eight years false. (*See id*. at Ex. D, Asher Dep. at 28–29; Ex. F, Markarian Dep. at 37–38.)

Second, Plaintiff argues that Defendant's agents were fully aware Plaintiff needed a long term commitment "and was told by Asher shortly before [Hudkins] received the purchase order [Hudkins] would be receiving a purchase order for the 8 year life of the 180L Program;" thus, if Defendant could cancel the contract for convenience at any time, the Defendant misrepresented the terms of the purchase order.[1] (*Id*. at 17.) Indiana law holds that actual fraud claims may not be based on representations of future conduct, on broken promises, or on representations of existing intent that are not executed. *See Wallem*, 725 N.E.2d at 889. Asher's representations to Hudkins about the yet-to-be-issue purchase order cannot be characterized as a past or existing fact; rather, Asher's oral statements represent a promise or reflect his intent to issue a purchase order with certain terms at some point in the future. Therefore, Asher's statements cannot provide a basis for Plaintiff's fraud-based claims. *See Anderson v. Indianapolis Indiana AAMCO Dealers Adver. Pool*, 678 N.E.2d 832, 837 (Ind. Ct. App. 1997) ("These representations, even if false and misleading, cannot support an action for fraud in that they relate to future, as opposed to past or existing, facts." (citation omitted)). Because Plaintiff has failed to establish a necessary element of fraud, the Defendant is entitled to summary judgment as a matter of law.

---

[1] Hudkins stated he received the purchase order by fax on October 3, 2006. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. A, Hudkins Dep. at 61–64, 81.) He also admitted to not reading "the whole thing." (*Id*. at 64.)

**E. Conclusion**

The Court grants the Defendant's Motion for Summary Judgment (DE 73). As summary judgment has been decided in Defendant's favor, the Court does not need to address Defendant's Motion to Exclude the Testimony of Stan V. Smith (DE 46).

SO ORDERED on December 2, 2010.

　s/ Joseph S. Van Bokkelen  
JOSEPH S. VAN BOKKELEN  
UNITED STATES DISTRICT JUDGE
